Daniel **BROWN**, an infant, who brings this action by his next friend, Keith **BROWN**, Plaintiffs,

v.

Natalie **RAMSEY** and Ruby Hart, **Defendants.**

No. CIV.A.4:98CV75.

United States District Court, E.D. Virginia, Newport News Division.

Nov. 21, 2000.

912

Scott Meadows Reed, Scott M. Reed, P.C., Virginia Beach, VA, for Daniel Brown, an infant, who brings this action by his next friend, Keith Brown, plaintiffs.

John D. Radd, Richard S. Sperbeck, Huff, Poole & Mahoney, P.C., Virginia Beach, VA, for Natalie Ramsey, Ruby Hart, Karen Davis, Joseph Ramsey, Juanita Joyce, Mary Jane Leckrone, Billy K. Cannaday, Jr., defendants.

## OPINION AND ORDER

DOUMAR, District Judge.

This matter is before the Court on Defendants Natalie Ramsey's ("Ramsey") and Ruby Hart's ("Hart") Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons stated herein, the motion is **GRANTED.**

### I. *Factual and Procedural Background*

#### A. The Facts

Plaintiff Daniel Brown ("Daniel"), an infant, brought this suit through his father and next friend, Keith Brown ("K.Brown"), to redress an alleged violation of Daniel's federal civil rights incurred as a result of Ramsey's and Hart's use of a restraint hold against Daniel while he was enrolled in Ramsey's first-grade special education class at Aberdeen Elementary School in Hampton, Virginia. At all times relevant, Hart was Ramsey's classroom assistant.

Daniel suffers from Asperger's Syndrome, a neurological disorder that, according to Plaintiff's expert Carol Schall, M.Ed, is "in the 'family' of autism and is very similar to 'high functioning autism.' Very often people with Asperger's [S]yndrome are referred to correctly as 'having autism.'" Schall Aff., at 4. While individuals with Asperger's usually have average or above-average intelligence, and an intense interest in a particular subject-area or topic, they are also extremely awkward socially and have difficulty with social interaction and social communication. *See id.* at 2. Interestingly, Carol Schall also states in her affidavit that "it is important to note that the most common 'co-morbid' diagnoses for people with Asperger's disorder are depression, and post-traumatic stress disorder." Schall Aff. at 4. In addition to Asperger's, Daniel also suffers from Restrictive Airways Disease and asthma. *See* Carol Brown Aff., Pl.'s Ex. 2.

From September 1995 to mid-March 1996, Daniel was a student in Ramsey's first-grade special education class. Daniel was 6 years old at the time. As a special-education student, Daniel's instructional program at the school was governed in part by his Individualized Education Program ("I.E.P."). An I.E.P. describes the educational goals that the school will focus on achieving with the student, as well as specific procedures or devices that are authorized for use in achieving these goals. Daniel was covered by two I.E.P.s that are relevant for purposes of this case.

First, in an I.E.P. dated July 18, 1995, and allegedly covering Daniel's education from July 18, 1995 to January 4, 1996, one of Daniel's educational goals was to "demonstrate the ability to comply with class and school rules consistently [sic] with the behavior management program in use." *See* Def.'s Ex. 2.B, To effectuate that goal, the July 19, 1995 I.E.P. states that "in the event that Daniel becomes a danger to himself or to others, he will be physically restrained in a safe manner until he demonstrates the ability to control his own impulses." *Id.* While a November 2, 1995 addendum to the July 18, 1995 I.E.P. bears the signature of Daniel's mother, Carol Brown, the original July 18, 1995 I.E.P. does not appear to be signed by either Carol or Keith Brown. Nonetheless, at her deposition, Carol Brown admitted that the first I.E.P. was legal and in effect until November 2, 1995. *See* Carol Brown Dep., at 82, Pl.'s Ex. 9.

In a second I.E.P. dated November 2, 1995, and allegedly covering the period from November 29, 1995 to November 29, 1996, one of Daniel's goals is "to improve classroom behavior." *See* Def.'s Ex. 2.C. To effectuate that goal, the November 2, 1995 I.E.P. states that "off trust area and physical restraint may be used when necessary for the safety of the child and others." *Id.* Carol Brown signed the November 2, 1995 I.E.P. on November 29, 1995. *See id.* Moreover, the restraint authorized by both I.E.P.s is consistent with Va.Code. Ann. § 22.1–279.1, which provides that the

> prohibition of corporal punishment shall not be deemed to prevent (i) the use of incidental, minor or reasonable physical contact or other actions designed to maintain order and control; ... (iii) the use of reasonable and necessary force to prevent a student from inflicting physical harm on himself; (iv) the use of reasonable and necessary force for self-defense or the defense of others.

*Id.* The statute reflects an express legislative intent to defer to teachers who are often required to make difficult and expeditious decisions: "In determining whether a person was acting within the exceptions provided in this section, due deference shall be given to reasonable judgments at the time of the event which were made by a teacher ...." Va.Code. Ann. § 22.1–279.1.

On the evening of March 13, 1996, while playing a game of bean-bag toss with his mother, Daniel first alleged that Ramsey and Hart had physically abused him throughout the 1995–1996 academic year by placing him in a restraint hold that "suffocated" him or caused him to experience a choking sensation. *See* D. Brown Dep., Vol. 1, at 22, Pl.'s Ex. 7. The hold that Ramsey and Hart allegedly used is known as a "basket hold," and Plaintiffs maintain that it was accomplished by clasping Daniel at his wrists, crossing his arms in front of his body, and pushing his head into his chest. *See id.* Ramsey and Hart allegedly used the hold approximately 40 different times to restrain Daniel while he was being placed in "time-out." *See* D. Brown Dep., Vol. 1, at 18, Pl.'s Ex. 7. At his discovery deposition,[1] Daniel described the hold, saying "[t]hey would put my hands—so I can't breathe, and they would, like, cross my arms and hold them from my back and one would push my head down." *See* D. Brown Dep., Vol. 1, at 28, Pl.'s Ex. 7.

---

1. Daniel was ten at the time of his discovery deposition on October 20, 1999.

More importantly, Daniel also stated that Hart and Ramsey would let him out of the hold when he "stop[ped] crying." *See* D. Brown Dep., Vol. 1, at 22, Pl.'s Ex. 7. When asked at his deposition what the teachers wanted him to do while he was in time-out, Daniel responded that "the teachers, what they wanted me to do was stop crying and be quiet." *See* D. Brown Dep., Vol. 1, at 27, Pl.'s Ex. 7. When Daniel was asked why he was placed in time-out in the first place, the following exchange occurred:

Q: Why were you put in time-out [in Ramsey's classroom]?

A: For stuff and part of my disability—autism is that you may not hear somebody the first time, and once I asked her—for the teacher to repeat something two times, she put me in time out for that.

Q: Who put you in time-out for that?

A: I can't remember, but throughout the whole year, the number of times I was put in time-out was probably 40. And Ramsey and Ruby Hart were doing it. Sometimes together, sometimes one of them.

Q: What do you mean by being put in time-out?

A: Okay. They put me behind this cardboard box for a washer, and they put your arms—they put your face down into your arms, and they push your head down—push your head down into your arms so you can't breathe.

. . . . .

Q: One time you were put in time-out because you asked a teacher to repeat a question twice. Why were you put in time-out all the other times?

A: Well, maybe for various reasons. *For bad behavior.* I learned spitting from other kids.

*See* D. Brown Dep., Vol. 2, at 14–17, Pl.'s Ex. 7 (emphasis added).

Later in his deposition, Daniel clarified that he was not placed in time-out for spitting, rather, in Ramsey's classroom the penalty for spitting was having to go spit in the toilet:

Q: But you weren't put in time-out for spitting?

A: No. I wasn't put in time-out for spiting. They made me spit in a toilet.

Q: Okay. What did you do that caused you to be put in time-out in [Ramsey's classroom]?

A: You mean Ms. Ramsey, what was the question again?

Q: You indicated that you were in time-out in Ms. Ramsey's classroom about 40 times. Is that right?

A: Yes.

Q: What did you do to be put in time-out?

A: Various things, but I can't remember many of them.

Q: Well, which ones can you remember?

A: Which ones can I remember? I don't think I can remember them right now.

*See* D. Brown Dep., Vol. 2, at 19–20, Pl.'s Ex. 7.

The Browns allege that Ramsey was motivated to act abusively towards Daniel because: (1) she resented having Daniel in her classroom, due to the Browns' active role in the education of their son and the increased administrative supervision over Ramsey that came with Daniel's placement in her classroom; and (2) Ramsey, who is Caucasian, resented racial slurs that Daniel (who is also Caucasian) allegedly muttered about Hart as well as his fellow classmates who were "dark-skinned." *See* Pl.'s Br. at 5; Carol Brown Dep., at 74–87, 138, 139, 147, Pl.'s Ex. 9. Conversely, the Browns have offered no such motivating factors or any other explanation for why Hart would act abusively toward their son.

It is undisputed that the alleged instances of abuse or suffocation left no physical manifestations of injury of any kind whatsoever on Daniel. Nor did Daniel's parents ever take him to a medical doctor for

any physical injury that he may have sustained in Ramsey's classroom. *See* Carol Brown Dep., at 52, Pl.'s Ex. 9. At his deposition, Daniel was asked the following:

Q: Okay, When you were in time-out, Daniel, and you said that Ms. Ramsey or Ms. Hart, or both, would suffocate you, did you ever show your mom any bruises or any bleeding or any cuts, or did anything happen to your body?

A: Not from the suffocation.

. . . . .

Q: Did you have any cuts or scratches or anything wrong with your body after you came out of time-out with Ms. Ramsey or Ms. Hart?

A: No. But I have lots of emotional hurt.

Q: "Lots of emotional hurt." What do you mean, "emotional hurt"?

A: All this is hurting the whole family, and it—

Q: Is that something your mom and dad told you?

A: —and I have bad dreams.

Q: When is the last time you have had a bad dream about this?

A: A while ago.

Q: Months or years?

A: Years ago.

*See* D. Brown Dep., Vol. 2, at 36–38, Pl.'s Ex. 7.

On February 13, 1998—almost two years after Daniel first reported the alleged abuse to his mother in March 1996 and four months prior to filing this suit in June 1998—Ms. Brown took Daniel to see a psychotherapist, Suzanne K. Gregg, Ph. D., who is a witness for the plaintiff in this case. *See* Gregg Dep., at 7, Pl.'s Ex. 7. When asked what the initial purpose was for her sessions with Daniel, Dr. Gregg responded that "[Mr. and Mrs. Brown] had requested services because of Daniel's distress about prior incidents and knowing

that he would need to overcome this distress as well as possibly talk about it in a court setting at some point if their pursuit of a lawsuit was successful." *See id.* at 6– 7. Thereafter, Dr. Gregg diagnosed Daniel with Post–Traumatic Stress Disorder,[2] and her interview notes reflect that while Daniel reportedly suffered nightmares at the time of the allegedly abusive incidents in 1995 and 1996, "those were gone now, two years later," in 1998. *See id.* at 10. Interestingly, Dr. Gregg also diagnosed Ms. Brown with Post–Traumatic Stress Disorder. *See id.* at 12. Dr. Gregg's counseling sessions with Daniel ended in November 1999. *See id.* at 22. At her deposition, Dr. Gregg was asked the following:

Q: As of November of 1999, did he still, in your opinion, suffer from posttraumatic stress disorder?

A: In certain pockets, not as—not as full blown across the profile. So that he was able to see school and not have carry-over effects of a school as a frightening place. So he was able to move past some of the associative avoidance that PTSD requires. But there were still others that would bring on the same kind of reaction. And it was, you know, particularly talking about the distressing moments.

. . . . .

Q: If I understand you correctly, he was still exhibiting some symptoms of posttraumatic stress disorder when you last saw him in November of '99?

A: In the area that had to do simply with the court testimony and not in other arenas, to the best of my knowledge.

. . . . .

Q: Do you have an opinion as to whether Daniel suffered any other injury other than the posttraumatic stress

---

**2.** As noted *infra*, it is interesting that Plaintiff's expert on Asperger's Syndrome stated in her discovery deposition that Asperger's is

often diagnosed as depression or Post–Traumatic Stress Disorder. *See* Schall Aff., at 4.

disorder as the result of this contact with Mrs. Ramsey?

A: That was the focus of my work with him.

*Id.* at 22, 27–29.

For their part, Ramsey and Hart do not deny placing Daniel in a restraint hold, however they vigorously dispute Plaintiffs' version of the severity of the hold as well as the number of instances that Daniel was allegedly restrained. Ramsey states that she used a restraint hold on Daniel "6 or 7 times," all between September 1995 and January 1996. *See* Ramsey Dep., at 117, Pl.'s Ex. 4. According to Ramsey, she would cross Daniel's arms while holding his wrists, and the hold would last between five seconds and a minute. *See id.* at 38. She was taught this restraint hold during a two-day nonviolent crisis intervention class sponsored by the Hampton City Schools in November 1990, and in turn Ramsey showed the technique to Hart. *See* Ramsey Aff. ¶ 2, Def.'s Ex. 2. She alleges that she only restrained Daniel when he became a danger to himself or to others, and that she restrained Daniel 3 to 4 times when he picked up floor tiles and threatened to use them as weapons. *See* Ramsey Dep., at 119, Pl.'s Ex. 4. Similarly, Hart, in her affidavit, states that

> Daniel Brown was one of the students in our special education classroom. At times, Daniel Brown threatened to or actually threw items in the classroom and climbed on desks and tables and refused orders to get down. At other times, he would strike or scratch other students and not keep his hands to himself. When Daniel refused to stop this behavior, either Natalie Ramsey or I would briefly restrain him to calm him down utilizing the basket hold technique which Natalie Ramsey had taught me. This technique involved reaching around Daniel's chest from behind and hold his arms crossed in front of him until he calmed down. I also observed Natalie Ramsey use this technique on occasions with Daniel. At no time did either Na-

talie Ramsey or I suffocate the child or cause him to be hurt when utilizing this restraint technique.

Hart Aff., Def.'s Ex. 1.

Ramsey's and Hart's version of these events is corroborated by the affidavit of Darian Futrell, a student-teacher assigned to Ramsey's special education class in February and March of 1996. Futrell states as follows:

> In February and March 1996, I worked as a student teacher in the special education class taught by Natalie Ramsey at the Aberdeen Elementary School. Daniel Brown was one of the students in that class. Daniel Brown would sometimes exhibit disruptive behavior and throw tantrums and flail his arms. When Daniel engaged in these tantrums, he disrupted the class and was in danger of hurting himself. I observed Natalie Ramsey restrain Daniel several times when he was throwing these tantrums. Natalie Ramsey would stand behind him and hold his hands to prevent him from flailing his arms and hurting himself or others. I never saw her suffocate Daniel or exercise any restraint which was excessive or inappropriate. Ms. Ramsey was simply trying to calm Daniel down. While I was a student teacher in her class, I observed her restrain Daniel in this manner two to three times.

Futrell Aff., Def.'s Ex. 4.

## B. Procedural History

Against that backdrop of events, on June 12, 1998 Plaintiffs filed this action against eleven Defendants, including Ramsey, Hart, various other employees of the Hampton City Schools, and three social workers, claiming that Daniel's federal civil rights were violated as a result of Ramsey's and Hart's allegedly abusive conduct.

After Motions to Dismiss were filed by all defendants, Magistrate Judge Bradberry issued a lengthy report and recommendation on February 25, 1999, recommending that the motions to dismiss be granted

in part. Both the Plaintiffs and Defendants filed objections to the Magistrate Judge's report, and, on March 30, 2000, Judge Morgan entered an order that (1) affirmed the Magistrate Judge's report; (2) dismissed all of Plaintiffs' claims except for Plaintiffs' 42 U.S.C. § 1983 claim against Ramsey and Hart for an alleged violation of Daniel's substantive due process rights; and (3) denied Plaintiff's Motion for Permission to File an Amended Complaint.

Defendants Ramsey and Hart filed a Motion for Summary Judgment against Daniel's § 1983 claim on August 25, 2000, and, after petitioning the Court for and receiving an extension of time to respond, the Plaintiffs filed their brief in response to that motion on October 10, 2000. The Defendants filed a rebuttal brief on October 16, 2000, and the Plaintiffs filed supplemental affidavits on October 30, 2000. The Court heard oral argument on Defendant's motion on October 31, 2000. As such, the matter has been fully briefed and discussed and is now ripe for determination.

## II. *Summary Judgment Standard*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment should be granted where "the pleadings, depositions [and] answers to interrogatories ... show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." The Supreme Court has construed Rule 56(c) to "mandate the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court explained that, "[i]n such situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an

essential element of the nonmoving party's case renders all other facts immaterial." *Id.* at 323, 106 S.Ct. 2548; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmoving party must demonstrate that there are specific facts that would create a genuine issue for trial. *See Anderson*, 477 U.S. at 250, 106 S.Ct. 2505. "Where ... the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." *United States v. Lee*, 943 F.2d 366, 368 (4th Cir.1991).

## III. *Analysis*

### A. Establishing a Substantive Due Process Violation and the Fourth Circuit's *Hall* Decision

■ Daniel can establish a § 1983 violation only by demonstrating that Defendants Ramsey and Hart violated his federal constitutional rights. Although the Supreme Court, it its seminal decision on school corporal punishment, left open the issue of whether public school students have a right under the Substantive Due Process Clause of the Fourteenth Amendment to remain free from excessive corporal punishment, *see Ingraham v. Wright*, 430 U.S. 651, 659 n.12, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) (holding that disciplinary corporal punishment of public school students by teachers and administrators does not give rise to an Eighth Amendment violation), the Fourth Circuit has made clear in the wake of *Ingraham* that there may be instances where excessive corporal punishment may indeed give rise to a substantive due process claim. *See Hall v. Tawney*, 621 F.2d 607, 611 (4th Cir.1980).

■ Mindful of the doctrine that "not every state law tort becomes a federally cognizable 'constitutional tort' under § 1983 simply because it is committed by a state official," the Fourth Circuit in *Hall*, borrowing heavily from precedent developed in excessive force claims arising in

the law enforcement area, enunciated an exacting standard for analyzing substantive due process/corporal punishment claims. *See id.* at 613. Under this standard,

> the substantive due process inquiry in school corporal punishment cases must be whether the force applied caused injury so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience.

*Id.* (citing *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.1973) (Friendly, J.)). Thus, the test that both parties concede as controlling the Court's disposition of this case involves four elements: (1) an application of force; (2) causing severe injury; (3) the force applied was disproportionate to the need presented; and (4) the force applied was so inspired by malice or sadism or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience. *See id.* The *Hall* decision has become a seminal case in the area of corporal punishment, and this test, or something very close to it, has been applied in all of the federal circuits to have considered the issue with the exception of the Fifth Circuit.[3]

## B. Precedent Developed under the *Hall* Standard

The caselaw that has developed under the *Hall* and its progeny is very helpful in fleshing out the paramaters of public school students' substantive due process right not to be subjected to excessive corporal punishment, *see Jones v. Witinski*, 931 F.Supp. 364, 367 (M.D.Pa.1996), and this body of precedent makes clear that

plaintiffs have a difficult burden to meet in order to survive a summary judgment motion. As substantive due process claims must necessarily be resolved on a case-by-case basis, the Court reviews the decisions made under the *Hall* analysis for guidance with the application of that analysis to the facts of the instant case.

### 1. Decisions Where Plaintiffs Survived a Summary Judgment Motion Under the Hall Analysis All Involve Severe Physical Injuries

In *Hall*, the Fourth Circuit held that beating a student so severely that he or she requires hospitalization plainly exceeds the threshold necessary to establish a constitutional violation. *See Hall*, 621 F.2d at 611. The student alleged that she had been subjected to punishment for no apparent reason and had been struck repeatedly and violently with a rubber paddle. *See id.* at 614. After the beating, the student was taken to the emergency room of a nearby hospital "where she was admitted and kept for a period of ten (10) days for the treatment of traumatic injury to the soft tissue of the left hip and thigh, trauma to the skin and soft tissue of the left thigh, and trauma to the soft tissue with ecchyniosis of the left buttock." *Id.* The district court granted the teacher's motion to dismiss for failure to state a claim. On these facts, however, the Fourth Circuit held that the student's allegations, if proven, stated a claim for relief under § 1983 and remanded the case. *See id.*

The teacher's conduct in *Garcia by Garcia v. Miera*, 817 F.2d 650 (10th Cir.1987), also rose to the level of a constitutional violation. The student was severely paddled on two separate occasions. On the first occasion, she was struck until her legs were bleeding. The second time, she was

---

**3.** The Fifth Circuit's analysis differs. The Fifth Circuit agrees that "corporal punishment in public schools is a deprivation of substantive due process when it is arbitrary, capricious, or wholly unrelated to the legitimate state goal of maintaining an atmosphere conducive to learning." *Fee v. Herndon*, 900 F.2d 804, 808 (5th Cir.1990). Nevertheless, the Fifth Circuit refuses to recognize a cause of action when there are adequate state remedies. *See id.* No other court has adopted this reasoning.

pushed against a desk and hit with a paddle until a welt formed. The district court agreed with defendants' assertion of qualified immunity and granted summary judgment in their favor. The Tenth Circuit reversed, stating:

[t]his nine-year-old girl was held up by her ankles and hit several times with a split board of substantial size on the front of her legs until they bled—supported by evidence of a permanent scar—are sufficient [to survive a motion for summary judgment]. The allegations with respect to the second beating, that the punishment was severe enough to cause pain for three weeks—supported by pictures of the injured buttocks, an affidavit from an examining doctor that in his long experience he had not seen bruises like that from routine spankings, and an affidavit from an examining nurse that if a child had received this type of injury at home she would have reported it as child abuse—are also sufficient. These claims may not survive the crucible of trial, but they overcome defendants' motion for summary judgment.

*Id.* at 658.

In *Webb v. McCullough*, 828 F.2d 1151, 1158 (6th Cir.1987), a student alleged that while she was on a trip to Hawaii with the school band, the school principal knocked down her locked bathroom door, hitting her twice with the door in the process, grabbed her, threw her against the wall, and slapped her. *See Webb*, 828 F.2d at 1154. The student had locked herself in the bathroom after being told that she and her roommates were being sent home because a teenage boy had been discovered in their room and because school officials had found alcoholic beverages in an adjoining, unoccupied room. The principal became quite angry with the student when she refused to come out of the bathroom, and he tried to jimmy the door lock. When that did not work, he slammed the door three or four times with his shoulder. When the door gave way, it struck the student. The principal then allegedly picked Webb up off of the floor, threw her against the wall, and slapped her. *See Webb*, 828 F.2d at 1154. The Sixth Circuit held that because McCullough acted out of malice or anger, not out of an effort to discipline the student or restore order, constitutional liability could attach to his conduct. *See Webb*, 828 F.2d at 1158–59. The court held:

[B]ecause [the principal] was in loco parentis to Webb and because it is possible that the blows were not disciplinary in nature, a trier of fact could find that under the circumstances, McCullough's need to strike Webb was so minimal or non-existent that the alleged blows were a brutal and inhumane abuse of McCullough's official power, literally shocking to the conscience. This makes summary judgment inappropriate.

*Id.* at 1158.

Most recently, in *Metzger by Metzger v. Osbeck*, 841 F.2d 518, 521 (3d Cir.1988), a physical education teacher overheard a male student in his swimming class use foul language in the course of a conversation with a female student about baseball cards. *See id.* at 519. The teacher walked up behind the male student and placed his arms around the student's neck and shoulders. While holding the student by the neck, the teacher questioned the student about his use of foul language. During the course of the questioning, the teacher moved his arm up slightly to a position just beneath the student's chin, forcing the student to stand on his toes to avoid being choked. When finally released from the hold, the student lost consciousness and fell to a pool deck, suffering lacerations to his lower lip, a broken nose, fractured teeth and other injuries requiring hospitalization. *See Metzger*, 841 F.2d at 519–20. Applying the *Hall* analysis to these facts, a split panel of the Third Circuit reversed the district court's grant of summary judgment in favor of the teacher and remanded the case for trial. *See id.* at 521.

### 2. Decisions Granting Summary Judgment to Defendants Under the Hall Analysis, Even Though Plaintiff Sustained Actual Physical Injury

On the other side of the coin, the courts have dismissed claims for conduct below the threshold of a constitutional violation under the *Hall* analysis, even where seemingly harsh or unfair punishment resulting in actual physical injury occurred.

This Court held in *Brooks v. School Board of Richmond*, 569 F.Supp. 1534, 1535 (E.D.Va.1983) (Warriner, J.), that pricking a student in the arm with a straight pin does not rise to the level of a constitutional violation. There, Judge Warriner stated:

> Regardless of how much a trial fleshes out the bare bones skeleton, this incident, in and of itself, simply cannot descend to the level of a brutal and inhumane, conscience-shocking, episode that the Fourth Circuit requires As the defendant aptly notes in her reply memorandum, allegations of twenty licks with a two-foot-long paddle causing a severe hematoma and loss of the use of a arm for a week did not shock the conscience of the United States Supreme Court in *Ingraham*.

*Id.* at 1536.

In *Darden v. Watkins*, 845 F.2d 325, 1988 WL 40083 (6th Cir.1988) (unpublished table decision), the Sixth Circuit, in an unreported decision, affirmed the district court's grant of summary judgment in favor of a fourth-grade teacher who gave a student three "licks" with a paddle for failure to complete a homework assignment. *See id.* at *1. When the child came home from school, his mother took him to an emergency room where he was examined by a physician "who observed a three- to four-inch area of reddish-blue discoloration over the fleshy part of the plaintiff's left buttock." *Id.* Nonetheless, applying the *Hall* analysis, the Sixth Circuit held that while the teacher's actions may have been unwise, they were not "inspired by malice or sadism" so as to establish a substantive due process violation. *See id.* at *5; *see also Saylor v. Board of Education*, 118 F.3d 507, 514–15 (6th Cir.1997) (affirming grant of summary judgment in favor of teacher and school officials under *Hall* analysis and holding as a matter of law in a corporal punishment case that bruises caused by five licks of a teacher's paddle did not "shock the conscience"); *Archey v. Hyche*, 1991 WL 100586, *2 (6th Cir.1991) (holding no substantive due process violation where a fifth grader suffered severe bruises on being paddled five times for humming in the boys' bathroom); *Wise v. Pea Ridge School District*, 855 F.2d 560, 562 (8th Cir.1988) (affirming grant of summary judgment and holding that teacher's paddling of sixth-grade student that caused bruising did not shock the conscience); *Hale v. Pringle*, 562 F.Supp. 598, 601 (M.D.Ala.1983) (holding that infliction of corporal punishment upon student, who was hit on the buttocks 3 to 5 times with a paddle causing minor bruising, did not violate student's substantive due process rights).

In *Brown v. Johnson*, 710 F.Supp. 183 (E.D.Ky.1989), a nine-year old student alleged that she had been spanked seven times with a paddle on three separate occasions over a thirty minute period. The student was severely bruised from the spanking. Nevertheless, the district court granted the defendants' motion for summary judgment, finding that neither the punishment inflicted nor the injuries sustained shocked the conscience of the court. *See id.* at 186.

In *Jones v. Witinski*, 931 F.Supp. 364 (M.D.Pa.1996), a teacher became angry at a disruptive student in his seventh-grade math class and, after first asking the student to leave the class, the teacher grabbed the student by the arm and pulled him across a desk before the student fell against a bulletin board and ended up on the floor. *See id.* at 365. The student allegedly suffered physical inju-

ries-including bruises-as well as "continuing psychological trauma." *See id.* at 368. Nonetheless, applying the *Hall* analysis, the district court granted the teacher's motion for summary judgement, stating that "[p]ulling a student by the arm is not 'a brutal and inhumane abuse of official power literally shocking to the conscience.'" *Id.* at 371 (quoting *Hall*, 621 F.2d at 613). According to the court,

> [t]he fact that [the student] may have sustained serious injury as a result of the fall is extremely unfortunate, but does not alter the character of [the teacher's] acts. It appears from all the evidence before us that [the teacher] never intended to harm [the student] nor cause him to fall against the bulletin board. There is no evidence which suggests otherwise. . . . [T]here is absolutely no evidence in this case from which a reasonable trier of fact could find intent to harm.

*Id.* at 371.

Most recently, in *Kurilla v. Callahan*, 68 F.Supp.2d 556 (M.D.Pa.1999), an eighth-grade student brought a § 1983 action against a teacher who punched him in the chest while breaking up a fight, causing the student to suffer from a bruise on his chest and a red mark on his neck. *See id* at 558. The incident also caused the student to "suffer[ ] from anxiety." *Id.* The teacher was subsequently tried and convicted of harassment under Pennsylvania state law. *See id.* Nonetheless, applying the *Hall* analysis, the district court granted the teacher's summary judgment motion. *See id.* at 564. Central to the court's holding in *Kurilla* was its decision that the injuries suffered by the student were not "severe" under the *Hall* analysis:

> In this case, [the teacher's] punching of [the student] in the chest caused a bruise and some red marks. While [the student] sought medical care, there is no evidence that medical attention was reasonably necessary. [The student's] injuries did not even warrant x-ray examination or prescription of any medicine.

Thus, [the student's] injuries could hardly be described as "severe."

*Id.* Accordingly, while the court noted that the teacher's actions could be characterized as overzealous, they did not amount " 'to a brutal and inhumane abuse of official power literally shocking to the conscience.' " *Id.* at 564 (quoting *Jones v. Witinski*, 931 F.Supp. at 369).

### 3. Decisions Where Student Suffered No Physical Injury and Thus Could Not Withstand Summary Judgment Under the Hall Analysis

In *Lillard v. Shelby County Board of Education*, 76 F.3d 716 (6th Cir.1996), the Sixth Circuit held that a single slap, which did not result in physical injury, even if given for no legitimate purpose, does not rise to the level of a constitutional violation. *See id.* at 726. The court stated: "[I]t is simply inconceivable that a single slap could shock the conscience. We do not quarrel with a suggestion that [the teacher's] actions were careless and unwise; but they fall far short of 'brutal,' or 'inhumane,' or any of the other adjectives employed to describe an act so vicious as to constitute a violation of substantive due process." *Id.* at 726. The court went on to stress that while it certainly did not condone or excuse the teacher's conduct, it could not find that one slap, "even if made for no legitimate purpose, rises to the level of a constitutional violation. While [the teacher] should reasonably expect to face serious consequences for his treatment of [the student], those consequences should not be found in a federal court through the mechanism of a section 1983 action." *Id.*

Fewer cases have addressed the issue of alleged psychological abuse, which is the only injury that Daniel clams to have suffered in the instant case. Nonphysical cases of harassment, or abuse, other than sexual abuse, have applied the same "shocks the conscience" standard.

In *Abeyta v. Chama Valley Independent School District*, 77 F.3d 1253, 1258 (10th Cir.1996), the twelve-year-old plaintiff al-

leged that her teacher had repeatedly called her a prostitute in front of the class over a month-and-a-half period, and instigated her classmates into calling her the same. The Tenth Circuit analyzed the girl's claim as a substantive due process claim for psychological abuse. *See id.* at 1255. While finding the teacher's conduct reprehensible, the Tenth Circuit also found his conduct below the constitutional threshold established by *Hall* and its progeny. The court stated:

> A teacher who calls a student a prostitute engages in a complete abuse of his authority. To do so repeatedly, and turn a deaf ear as other students follow the teacher's example, is flagrant misconduct. But we must leave plaintiff to whatever relief statutory or state tort law may afford her.
>
> ... [W]e hold that taking plaintiff's claims as true they do not state an actionable § 1983 claim ....

*Abeyta,* 77 F.3d at 1258.

#### 4. *Summary*

To summarize, conduct that might give rise to a state law tort claim does not necessarily give rise to a constitutional claim.[4] The threshold for establishing a constitutional tort for excessive corporal punishment is a high one. The plaintiff must allege more than the commission of an ordinary common-law tort. *See Abeyta,* 77 F.3d at 1257. The Sixth Circuit explained the distinction between the two in *Webb* stating:

> In the context of disciplinary corporal punishment in the public schools ... the substantive due process claim is quite different than a claim of assault and battery under state tort law. In resolving a state tort claim, decision may well turn on whether ten licks rather than five were excessive ... so that line-drawing this refined may be required.

But substantive due process is concerned with violations of personal rights of privacy and bodily security of so different an order of magnitude that inquiry in a particular case simply need not start at the level of concern those distinctions imply. As in the cognate police brutality cases, the substantive due process inquiry in school corporal punishment cases must be whether the force applied caused injury so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience .... *Not every violation of state tort and criminal assault laws will be a violation of this constitutional right, but some of course may.*

*Webb,* 828 F.2d at 1158 (emphasis added) (quoting *Hall v. Tawney,* 621 F.2d at 613). *See also Brooks,* 569 F.Supp. at 1538. As Judge Friendly stated in *Johnson v. Glick,* 481 F.2d 1028 (2d Cir.1973),

> "[i]n determining whether the constitutional line has been crossed, a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."

*Id.* at 1033; *see also Darden,* 1988 WL 40083, at *4 (quoting *Wilson v. Beebe,* 770 F.2d 578, 582 (6th Cir.1985) (en banc)).

#### C. Application of the *Hall* Test to the Instant Case

■ Applying this body of precedent and the test enunciated by the Fourth Circuit in *Hall* to the facts of the instant case, the Court finds that *Hall*'s exacting

---

**4.** The Court is not suggesting, however, that Plaintiffs in the instant case have any possible cause-of-action against the Defendants under a state-law theory. The Court merely wishes to emphasize that state-law claims and federal constitutional torts are two entirely different animals, the existence of the latter being much more difficult to prove.

analysis has not been met and therefore Defendants' Motion for Summary Judgement must be granted.

First, as the caselaw discussed above makes clear, *Hall* requires a "severe" injury; Daniel's only injury appears to be that he experienced some pain and suffering at the time of the alleged abuse (for which he never sought medical attention) and that he either currently suffers or has suffered from Post–Traumatic Stress Disorder. The alleged incidents of abuse never manifested any physical injury in Daniel, and he was never taken to or treated by a medical doctor in connection with these alleged incidents. The lack of any physical injury in this case contrasts sharply with the severe physical injuries sustained in school excessive force cases where summary judgment was denied. *See, e.g., Metzger*, 841 F.2d at 521 (student sustained a broken nose, fractured teeth, lacerations, and other injuries requiring hospitalization); *Webb*, 828 F.2d at 1154 (student was slapped, hit with a door, and thrown against a wall by a school principle); *Garcia*, 817 F.2d at 658 (student was hit multiple times with a split board causing bleeding and a permanent scar); *Hall*, 621 F.2d at 607 (student was beaten with a paddle to such a degree that hospitalization for a period of ten days was required). Plaintiff has not cited, and the Court is not aware, of any reported corporal punishment case that has survived a summary judgment motion where the plaintiff has not sustained a physical injury but instead claims to suffer from Post–Traumatic Stress Disorder or some other similar psychological injury. Conversely, numerous courts have granted summary judgment or motions to dismiss against plaintiffs even where the plaintiff could show real and actual physical injury. *See, e.g., Darden*, 1988 WL 40083 (student given three licks with paddle resulting in reddish-blue discoloration of his buttocks); *Kurilla*, 68 F.Supp.2d at 558 (student suffered bruise, red marks, and anxiety attacks from teacher's punch to the chest); *Jones*, 931 F.Supp. at 365 (teacher threw

student over a desk, causing injury); *Brown*, 710 F.Supp. at 183 (student left severely bruised from being spanked seven times with a paddle over a thirty minute period did not "shock the conscience" of the court); *Brooks*, 569 F.Supp. at 1535 (pricking a student in the arm with a straight pin does not rise to the level of a constitutional violation). And plaintiffs have fared no better where psychological damage has formed either the sole basis of or been an element of the plaintiff's substantive due process claim. *See Abeyta*, 77 F.3d at 1258 (holding that where twelve-year old plaintiff was called a prostitute in front of her class and allegedly suffered psychological injury, teacher's actions did not rise to the level of a constitutional tort as they did not "shock the conscience"); *Kurilla*, 68 F.Supp.2d at 558 (holding that while teacher's punch to student's chest caused bruising and anxiety attacks in plaintiff, such conduct and the resultant injury did not shock the conscience); *Jones*, 931 F.Supp. at 365 (student suffered "continuing psychological trauma" and other injuries from being thrown over a desk by a teacher, nonetheless, such conduct did not "shock the conscience"). Accordingly, assuming the facts in a light most favorable to Plaintiffs, the Court holds as a matter of law that no reasonable jury could conclude that Daniel's alleged injuries in this case are "severe" under the *Hall* analysis and thus the alleged abuse does not rise to the level of a constitutional violation

Second, *Hall* requires that the Plaintiffs show that the actions of Ramsey and Hart were disproportionate to the need presented. Plaintiffs cannot carry this burden, as Daniel's own testimony indicates that he the alleged abuse was not administered arbitrarily but instead only occurred in connection with his being placed in time-out. When asked why he was placed in time-out, Daniel responded that he was given time-out for various reasons, including bad behavior, and that the physical restraint that accompanied his placement

in time-out would end when he would "stop crying and be quiet." *See* D. Brown Dep., Vol. 1, at 27, Pl.'s Ex. 7. Moreover, Daniel's I.E.P.'s, and the laws of the Commonwealth of Virginia, explicitly authorize the use of physical restraint in certain situations. *See* Def.'s Ex. 2.B, 2.C; Va.Code Ann. § 22.1–279.1 (2000). Considering these facts in a light most favorable to Plaintiffs, the Court finds that no reasonable jury could conclude that the force applied by Ramsey and Hart was disproportionate to the need presented under the test enunciated in *Hall* and its progeny.

Third, and finally, *Hall* requires that Ramsey's and Hart's actions be "so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." *See id.* at 613. As motivating factors for the alleged abuse of Daniel, Mr. and Mrs. Brown state that Ramsey (1) resented having Daniel in her classroom, due to the Browns' active role in the education of their son and the increased administrative supervision over Ramsey that came with Daniel's placement in her classroom; and (2) Ramsey, who is Caucasian, resented racial slurs that Daniel (who is also Caucasian) allegedly muttered about Hart as well as his fellow classmates who were "dark-skinned." *See, e.g.,* Pl.'s Br. at 5; Carol Brown Dep., at 74–87, 138, 139, 147, Pl.'s Ex. 9; Keith Brown Aff. The Plaintiffs have not set forth or pointed to any such motivating factors with regard to the conduct of Hart that suggest she may have acted with "malice or sadism."

As the cases discussed in this Opinion make clear, even taken as true, the motivating factors Plaintiffs' attribute to Ramsey's conduct do not rise to the level of "malice or sadism" required by *Hall* and its progeny. No reasonable jury could find, on these facts, that Ramsey and Hart possessed such a malevolent state of mind. And even if the motivating factors of Ramsey and Hart, as stated by Mr. and Mrs.

Brown, would support such an inference, the nature of the injury and the manner in which it was inflicted still do not support an inference of brutal or inhumane conduct shocking to the conscience. *See Hall,* 621 F.2d at 613.

■ While the Court appreciates the sincerity with which the Browns have pursued a remedy for the alleged abuse suffered by Daniel, like other courts that have considered these issues, there is nothing before the Court to suggest that the alleged actions of Ramsey and Hart were anything other than a disciplinary measure within the sound discretion of the teacher. *See Jones,* 931 F.Supp. at 371; *Brown,* 710 F.Supp. at 187. While the Plaintiffs may under some stretch of the imagination bring a cause-of-action under some state-law tort theory unknown to the undersigned, the standards for establishing a constitutional injury are far higher and Plaintiffs have failed to meet the exacting standards as stated by the Fourth Circuit in *Hall.* Again, evidence that may give rise to a tort claim will not necessarily establish a substantive due process violation under § 1983; the mere fact that a state official may have committed a tort will not suffice to support a cause of action for constitutional harm. As aptly stated by our Supreme Court, "Our Constitution deals with the large concerns of the governors and the governed, but it does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend to living in society." *Daniels v. Williams,* 474 U.S. 327, 332, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *see also County of Sacramento v. Lewis,* 523 U.S. 833, 854, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) ("Decisions about civil liability standards that 'involve a host of policy choices … must be made by locally elected representatives [or by courts enforcing the common law], rather than federal judges interpreting the basic charter of Government for the entire country.'" (quoting *Collins v. City of Harker Heights,* 503 U.S. 115, 129, 112 S.Ct. 1061,

117 L.Ed.2d 261 (1992))). Schools and school teachers not only have a duty not to employ unconscionable restraints against individual students, but they also have a duty to educate other students within a class setting and to cure disruptive behavior that would deny the educational opportunities of other students. Otherwise, schools cannot function at all. Accordingly, the Defendants' Motion for Summary Judgment is **GRANTED.**

### III. *Conclusion*

For the reasons set forth above, Defendants' Motion for Summary Judgement is **GRANTED.** The remaining counts of Plaintiff's Amended Complaint are **DISMISSED WITH PREJUDICE.**

The Clerk of the Court is **DIRECTED** to forward copies of this Opinion and Order to all counsel of record.

**IT IS SO ORDERED.**