**S.M., in her capacity as the natural parent, guardian, and next of friend of her minor child, L.G., Plaintiff,**

v.

**THE LAKELAND SCHOOL DISTRICT, Robert Gigharelli, in his official capacity as Superintendent, and Anthony Cerra, Individually and in his capacity as a teacher in the School District, Defendants.**

No. 3:CV–99–0523.

United States District Court,
M.D. Pennsylvania.

June 26, 2001.

## MEMORANDUM

VANASKIE, Chief Judge.

On April 1, 1999, plaintiff S.M., on behalf of her minor child, L .G., commenced this civil rights action pursuant to 42 U.S.C. § 1983, alleging constitutional violations arising from an incident during which L.G's fifth grade teacher, Anthony Cerra, repeatedly yelled at her during math class.[1] Named as defendants are Cerra, the Lakeland School District, and Robert Gigharelli, the School's Superintendent.[2] Cerra is sued on the basis of his alleged verbal abuse of L.G. The Lakeland defendants are sued on the basis of having a policy, practice or custom of condoning Cerra's alleged verbal abuse of elementary school students.[3] The Lakeland defendants and Cerra, in separate motions, filed for summary judgment on May 1, 2000. Because Cerra's conduct is not so egregious as to "shock the conscience," he is entitled to summary judgment on plaintiff's substantive due process claims. Because the alleged verbal abuse did not infringe a protected liberty interest, the Lakeland defendants are entitled to summary judgment on plaintiff's claim of a policy, custom or practice to tolerate verbally abusive conduct.

## BACKGROUND

Defendant Anthony Cerra has been an elementary school teacher in the Lakeland School District since 1973. (Plaintiff's Ex. 4: Dep. of Cerra, p. 5.) From time to time, parents of students in his classes have complained about his teaching and disciplinary techniques. For example, on October 10, 1998, the Elementary School Principal stated in a written report that Mr. Cerra had "a tendency to 'badger' students

---

1. S.M.'s claim on her own behalf against the defendants was dismissed by Order of this Court dated September 16, 1999 (Dkt. Entry 21).

2. Defendants Lakeland School District and Robert Gigharelli shall hereinafter be referred to collectively as "the Lakeland defendants ."

3. It should be noted that Superintendent Gigharelli has been sued only in his official capacity. Thus, the claims against him are properly treated as claims against the School District.

and make examples of them in front of classmates when [he was] trying to reprimand [them]." (Plaintiff's Statement of Undisputed Facts, ¶ 22.) During the early part of the 1979–1980 school year, an Elementary School Assistant Principal sent Mr. Cerra a memorandum reporting on three incidents of Mr. Cerra reprimanding or disciplining students in a loud voice. (*Id.* at ¶ 23.) In early 1980, a parent complained about Mr. Cerra throwing tape at a blackboard and knocking straws off a table. (*Id.* at ¶ 24.) The school records indicate that in December, 1980, Mr. Cerra was accused of "mental child abuse" by Children and Youth Services. (*Id.* at ¶ 26.)[4] In April of 1981, an Assistant Principal memorialized an incident during which Mr. Cerra was yelling at a student who was working on a math problem at the blackboard. In November of 1983, the School Principal wrote to Mr. Cerra as a result of an incident during which he tipped a desk, observing that "[t]o fourth graders, this action may be threatening." (*Id.* at ¶ 29.) In a memorandum dated September 26, 1984, the School Principal wrote that he was required to enter Mr. Cerra's classroom the previous day to investigate why Mr. Cerra was speaking in a raised voice. The School Principal indicated that, "[a]s I stood in your room, it was obvious to me by the intensity of your voice and the finger you pointed in the boy's face while he cried, that you lost you composure." (*Id.* at ¶ 33.)

There is no evidence of any complaints about Mr. Cerra's classroom behavior for a period of eleven years, from September of 1984 until September of 1995. During the 1995–96 school year, there were three documented incidents of Mr. Cerra yelling at students or belittling them. (*Id.* at ¶¶ 36–38.) There are no documented incidents of inappropriate conduct during the 1996–97 school year. In May of 1998, the school principal documented an occasion when Mr. Cerra was screaming at one of his students, "pointing a finger in his face while calling him a liar." (*Id.* at ¶ 40.) In a letter to Mr. Cerra in September of 1998, the School Principal wrote that Mr. Cerra's "past year's classroom behavior, especially in dealing with a student in your home room, was inappropriate and will never again be tolerated." (*Id.* at ¶ 43.) The School Principal further wrote that "[a]ny similar outbursts toward children such as screaming or using derogatory terms ... will be addressed swiftly and aggressively." (*Id.*) For the 1997–98 school year, Mr. Cerra received the lowest rating of any teacher at the elementary school. (Ex. 13 of the Lakeland School District.)

Mr. Cerra was plaintiff's fifth grade home room teacher for the 1998–99 school year. She was also in his math class. Plaintiffs have not presented evidence of any inappropriate conduct of Mr. Cerra from the beginning of the 1998–99 school year until December 15, 1998.

During math class on December 15, 1998, L.G., along with nine other students, was called to the board to do math problems on estimating. L.G. was having obvious difficulty solving the problem. After a period of time, Cerra told the students to sit down, with the exception of L.G., who was told to remain standing. Cerra asked L.G. repeatedly, in a loud voice, why she did not know the answer, and what the answer was. According to L.G., Cerra had his finger in her face as she was standing

---

**4.** Plaintiffs have not produced any evidence to show that there was any substance to the alleged "mental child abuse" claim, and Mr. Cerra testified at his deposition that the charge was unfounded and no further action was ever taken regarding it. (Cerra Dep. at 10–11.)

by her desk. L.G. began crying. At one point, L.G. exclaimed, "Jesus Christ, stop yelling at me. You're driving me crazy." Cerra told L.G. to leave the classroom, but then changed his mind and told her to come back. He then came close to L.G.'s face and said "Don't ever say that in the classroom." At no time did Cerra physically touch L.G.

At the end of the period, L.G. left the classroom crying and asked Mrs. Butler, the physical education teacher, whether she could go to the nurse's office to call her mother. After calling her mother, L.G. went to have lunch with her friends. According to L.G.'s mother, L.G. was very distraught and nervous that evening. She had difficulty sleeping the night of the incident. The day after the incident, L.G. developed hives, for which she sought treatment, and also complained of a nervous stomach, which lasted for a day or two.

The day after the incident, the School Principal, William Giannetta, conducted a meeting at the school. Present were L.G., her mother, L.G.'s aunt and cousin,[5] the school guidance counselor, Mr. Cerra and Mr. Giannetta. After the meeting, Cerra met with twelve students from his class in the school cafeteria, where he discussed the incident concerning L.G. Some of the students later went to talk with Mr. Giannetta.

Mr. Giannetta conducted an investigation of the incident. His investigation included discussions with L.G., her mother, her aunt, her cousin and Mr. Cerra. Mr. Giannetta also spoke with seven student witnesses who were present and allegedly upset by the incident. According to Mr. Giannetta's report, all of the students interviewed claimed that, although Mr. Cerra had raised his voice at L.G., he was not yelling. (Ex. 2 in App. of Lakeland School District .) Mr. Giannetta concluded that the incident did not occur as L.G. described it. (*Id.*) Because of L.G.'s inappropriate language, she served an in-school suspension for two days.

At the request of L.G.'s mother, and upon the agreement of the principal, L.G. was removed from Mr. Cerra's classroom and reassigned to a different teacher for the remainder of the year.[6] L.G. remained a student at the Mayfield Elementary School for the remainder of the 1998–99 school year. Other than an office visit with a doctor immediately after the incident, L.G. has not been treated by any health care professional as a result of the incident. Since the date of the incident, L.G. contends that she only suffered from one nightmare relating to Mr. Cerra. L.G. transferred to the Sacred Heart Elementary School at the end of the school year.

On April 1, 1999, L.G. brought this action, alleging that Mr. Cerra regularly engaged in verbal intimidation, as well as the use of physical force towards students.[7] She further alleged that the School District permitted such conduct to occur, and which resulted in a violation of her constitutional rights under the Fourth, Fifth, Eighth and Fourteenth Amendments of the United States Constitution. Plaintiff seeks compensatory and punitive damages. Currently pending are the defendants' mo-

---

**5.** L.G.'s cousin was a classmate of L.G.'s, and was present during the December 15th incident.

**6.** In order to be transferred, L.G. had to provide a doctor's note explaining the necessity of the transfer.

**7.** It bears noting that plaintiffs have failed to present any evidence that corroborates the bald assertion that Mr. Cerra had physically abused any student in his more than 25 years as a teacher. In fact, there is no evidence that Mr. Cerra ever struck a student.

tions for summary judgment. The issues have been fully briefed and are ripe for disposition.

## DISCUSSION

### A

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" if proof of its existence or non-existence might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Facts that could alter the outcome are material facts." *Charlton v. Paramus Bd. of Educ.*, 25 F.3d 194, 197 (3d Cir.), *cert. denied*, 513 U.S. 1022, 115 S.Ct. 590, 130 L.Ed.2d 503 (1994). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

Initially, the moving party must show the absence of a genuine issue concerning any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 329, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party. *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir.1988); *Continental Ins. Co. v. Bodie*, 682 F.2d 436, 438 (3d Cir.1982). Once the moving party has satisfied its burden, the nonmoving party "must present affirmative evidence to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 256–57, 106 S.Ct. 2505. Mere conclusory allegations or denials taken from the pleadings are insufficient to withstand a motion for summary judgment once the moving party has presented evidentiary materials. *Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir.1990). Rule 56 requires the entry of summary judgment, after adequate time for discovery, where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

### B

Section 1983 does not create substantive rights or impose obligations on government officials. Instead, it provides a cause of action by which persons may seek relief for governmental violations of rights protected by the United States Constitution or federal law. *See Albright v. Oliver*, 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994); *Cruz–Erazo v. Rivera–Montanez*, 212 F.3d 617, 621 (1st Cir.2000).

Eschewing reliance on rights protected by the Fourth and Eighth Amendments (although plaintiffs' complaint asserted that those provisions of the Bill of Rights were violated in this case),[8] plaintiffs ground their claim against Mr. Cerra on the Fourteenth Amendment guarantee that life, liberty or property will not be taken by governmental actors without due process. Specifically, plaintiffs rely on the

---

**8.** At page 7 of their brief in opposition to Mr. Cerra's summary judgment motion, plaintiffs state that the "readily concede that no actionable claim under the Fourth or Eighth Amendment to the United States Constitution is presented in the factual scenario underlying this matter."

substantive, and not the procedural, component of the due process clause.

■ Plaintiffs acknowledge that to present a viable substantive due process claim based upon abuse of governmental authority, a plaintiff must allege "more than the commission of an ordinary common law tort." (Brief in Opp. to Mr. Cerra's Summ. J. Mot. at 8.) The parties are in agreement that the applicable test is whether the defendant's conduct "shocks the conscience." *County of Sacramento v. Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998); *Fagan v. City of Vineland,* 22 F.3d 1296, 1303 (3d Cir.1994) (*en banc*).[9] The conduct in question "must do more than 'offend some fastidious squeamishness or private sentimentalism ....'" *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973). Non-physical types of harassment, including verbal abuse, require the same "shock the conscience" analysis. *See Abeyta v. Chama Valley Independent School District,* 77 F.3d 1253, 1257 (10th Cir.1996); *Brown ex rel. Brown v. Ramsey,* 121 F.Supp.2d 911, 921 (E.D.Va.2000), *aff'd mem.,* —— F.3d ——, 2001 WL 536738 (4th Cir. May 21, 2001); *Jones v. Witinski,* 931 F.Supp. 364, 369 (M.D.Pa.1996). The threshold for establishing a substantive due process claim based on abusive conduct is set high in light of Supreme Court admonitions "against an overly generous interpretation of the substantive component of the Due Process Clause." *Fagan,* 22 F.3d at 1306 n. 6.

In this case, L.G. alleges only one instance when Mr. Cerra repeatedly yelled at her during class, while pointing his finger inches from her face. L.G. contends that she was humiliated and embarrassed by the incident and that she suffered from hives and nervousness for a few days after the incident. Mr. Cerra argues that L.G.'s allegations of verbal abuse are not sufficient to establish a constitutional violation.

Those courts that have considered instances of psychological or verbal abuse by government actors have typically held that such conduct alone was not severe enough to qualify as a constitutional tort actionable under section 1983. In *Abeyta v. Chama Valley Independent School District,* the plaintiff accused her teacher of violations of her substantive due process rights after her teacher called her a prostitute in front of the class and continued to refer to her in such a manner for a period of a few weeks. 77 F.3d at 1255. In affirming the entry of summary judgment for the teacher, the Tenth Circuit noted:

> We are unwilling to hold that actions which inflict only psychological damage may never achieve the high level of "a brutal and inhuman abuse of official power literally shocking to the conscience," necessary to constitute a substantive due process violation. We can imagine a case where psychological harassment might be so severe that it would amount to torture.... But we are sure that the actions alleged in the instant case do not reach that level—whether they were done with indiffer-

---

9. At pages 8 through 10 of plaintiffs' brief in opposition to Mr. Cerra's summary judgment motion, plaintiffs cite case law that recognizes that the pertinent inquiry is whether the challenged conduct "was so inspired by malice or sadism rather than merely careless or unwise excess of zeal, that it amounted to a brutal and inhumane abuse of official power literally shocking the conscience ...." *Webb v.*

*McCullough,* 828 F.2d 1151, 1158 (6th Cir. 1987) (quoted at p. 9 of Plaintiffs' Brief in Opp. to Mr. Cerra's Summ. J. Mot.). Analogizing plaintiffs' claim to corporal punishment cases, Mr. Cerra asserts that "if the alleged conduct is literally shocking to the conscience, Summary Judgment is inappropriate." (Brief in Supp. of Mr. Cerra's Summ. J. Mot. at 7.)

ence or with deliberate intent to cause psychological harm.

*Id.* at 1257–58.

In *Pittsley v. Warish*, 927 F.2d 3 (1st Cir.), *cert. denied*, 502 U.S. 879, 112 S.Ct. 226, 116 L.Ed.2d 183 (1991), the court addressed claims of verbal abuse and threats made by law enforcement officers. In one incident, the police officers allegedly told the minor plaintiffs that "if we see your father on the streets again, you'll never see him again." *Id.* at 5. In another incident, the police officers purportedly told the plaintiff mother that he wanted to break her husband's "kneecaps" and threatened to kill the mother. In affirming the entry of a directed verdict in favor of the law enforcement officers on plaintiffs' substantive due process claim, the court stated:

> The plaintiffs contend that, in light of the vulnerability of young children, the officer's statement that the children would never see [their father] again, and the refusal to allow the children to "hug and kiss" [the father] goodbye at the time of his arrest was so brutal, offensive and intimidating as to "shock the conscience." The children's alleged fear or [emotional] trauma which resulted from these spoken words and actions in this instance, however, is not sufficient to rise to the level of a constitutional violation under the standard enunciated in *Rochin [v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952) ]. As despicable and wrongful as it may have been, the single threat made by the officers is not sufficient to "shock the conscience."

*Id.* at 7. *See also Cruz–Erazo*, 212 F.3d at 622–24 (verbal threats and repeated harassment, but not physically intrusive or violent conduct, and which did not "strike at the basic fabric" of a protected relationship, such as the parent-child relationship,

was not sufficiently egregious as to "shock the conscience"); *Collins v. Cundy*, 603 F.2d 825, 827 (10th Cir.1979) (allegation that sheriff laughed at and threatened to hang a prisoner did not state claim under § 1983); *Shabazz v. Cole*, 69 F.Supp.2d 177, 200 (D.Mass.1999) ("without even a suggestion of physical injury, Cole's verbal abuse and racial epithets, although continuing for a long period of time, fall short of conscience shocking conduct.").

▪ "Although each determination of whether state conduct 'shocks the conscience' is necessarily fact-specific and unique to the particular circumstances in which the conduct occurred," *Cruz–Erazo*, 212 F.3d at 623, the established precedents, consistent with the Supreme Court's admonition against an overly generous reading of the substantive component of the due process clause, compel the conclusion that Mr. Cerra's conduct, although unfortunate, is not conscience shocking. Mr. Cerra's conduct consisted of repeatedly questioning L.G. about the math problem and reprimanding her for cursing in class. Plaintiff has not established how Mr. Cerra's conduct, even if considered inappropriate, could be construed as sadistic or malicious. Mr. Cerra may have been overzealous in conducting his class, but his conduct could not be termed "brutal." Even if done in a loud and confrontational manner, Mr. Cerra's behavior could not be considered as offensive as the behavior of the teacher in *Abeyta*. As in *Pittsley*, the single incident of inappropriate conduct directed at L.G. is simply not actionable under the due process clause.

Additionally, the emotional trauma and subsequent physical manifestations of that trauma that L.G. apparently suffered as a result of the incident could not reasonably be considered severe. This is especially true when L.G.'s injuries are compared to those of plaintiffs who suffered some form

of physical abuse at the hands of a teacher, and yet were found not to have suffered a violation of a constitutional right. *See Kurilla v. Callahan,* 68 F.Supp.2d 556 (M.D.Pa.1999)(striking student in chest which resulted in bruising did not constitute a violation of substantive due process); *Jones, supra* (teacher grabbing student by the arm and pulling him across the desk resulting in bruising and other physical injures did not rise to level of a substantive due process violation); *Lillard, supra* (single slap with no resulting physical injury was not a constitutional violation); *Brooks v. School Board of Richmond,* 569 F.Supp. 1534 (E.D.Va.1983)(pricking student in arm with a straight pin was not a constitutional violation). L.G. did not require medical attention or psychological counseling as a result of the incident.[10] Moreover, the physical symptoms—hives and a nervous stomach—disappeared after the meeting with Mr. Giannetta.

Plaintiffs attempt to buttress their claim against Mr. Cerra, based as it is upon a single incident involving L.G., by referring to a purported pattern of abusive behavior by this teacher. Thus, plaintiffs assert that "Cerra's repeated verbal abuse of the minor female Plaintiff in the educational setting of a fifth grade classroom, in light of Cerra's long-standing history of such behavior, does constitute a 'brutal and inhumane abuse of official power literally shocking the conscience.' " (Brief in Opp.

to Mr. Cerra's Summ. J. Mot. at 9–10, *quoting Metzger v. Osbeck,* 841 F.2d 518, 520 (3d Cir.1988).) Plaintiffs offer no factual support for the claim of *"repeated* verbal abuse" of L.G. The only evidence presented by plaintiffs is that on one date more than three months into the school year Mr. Cerra had a verbal confrontation with the fifth grade student. Moreover, plaintiffs have not adduced any evidence of a pattern of abusive conduct towards other students by Mr. Cerra in L.G.'s presence in the more than three months that L .G. was a student in his fifth grade class. Finally, plaintiffs have not cited any authority for the proposition that, in determining whether Mr. Cerra's conduct on a particular occasion was conscience-shocking, the decision maker is entitled to consider conduct involving non-parties as purported victims. It is L.G.'s rights under the due process clause at issue here, and the pertinent inquiry is whether the conduct vis a vis L.G. was sufficiently egregious as to literally shock the conscience.

In short, plaintiffs have not cited a single case to support the position that a single incident of verbal or psychological abuse is sufficient to violate the protection afforded by the concept of substantive due process. Because Mr. Cerra's actions towards L.G. were not so "brutal, demeaning and harmful as literally to 'shock the conscience of the court,' " summary judgment will be granted for Mr. Cerra.[11]

---

10. L.G. did see a doctor after Dr. Giannetta informed her that a doctor's report was necessary if she wanted to get transferred out of Mr. Cerra's class. Dr. Albert spoke with both L.G. and her mother about the incident, and authored a letter stating that he strongly recommended that L.G. be transferred from Cerra's class. (Exh. 3 in Lakeland defendants' Appendix.)

11. Entry of summary judgment in favor of Mr. Cerra should not be viewed as judicial

approbation of his conduct in this particular case or in other instances. It may be that his conduct would be actionable under state law, and no opinion on that point is intended to be expressed by the fact that his summary judgment motion will be granted. Plaintiffs have based this case solely on the Fourteenth Amendment to the Constitution, and Mr. Cerra's conduct simply does not meet the necessarily high threshold of a substantive due process violation.

**C**

Plaintiffs argue that the Lakeland defendants had a policy or custom which permitted Mr. Cerra to verbally abuse elementary school children. According to the plaintiffs, although the school district knew of Cerra's proclivity to yell at students, the school district's inaction and idle threats for a period of more than twenty years allowed Cerra to continue in this inappropriate behavior, resulting in the incident involving L.G.

■ A municipality may be held liable under section 1983 for violations of constitutional rights caused by an official policy or custom of the municipality.[12] *See Monell v. Dep't of Social Services*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Third Circuit precedent makes clear that a municipality's liability under section 1983 for a substantive due process violation does not depend upon the liability of the individual officer. *Fagan*, 22 F.3d at 1292; *Estate of Burke v. Mahoney City*, 40 F.Supp.2d 274 (E.D.Pa.1999), *aff'd mem.*, 213 F.3d 628 (3d Cir.2000). Rather, a section 1983 action against a municipality must be considered independently of the section 1983 claim against the individual state actor. *Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir.1996). Stated otherwise, the fact that a teacher's conduct does not shock the conscience does not necessarily relieve the school district of liability.

"If it can be shown that the plaintiff suffered an injury, *which amounts to a deprivation of life or liberty*, because the [teacher] was following a [school district] policy reflecting [the district] policymakers' deliberate indifference to constitutional rights, then the [district] is directly liable under Section 1983 for causing a violation of the plaintiff's Fourteenth Amendment rights." *Fagan*, 22 F.3d at 1292 (emphasis added).

■ The plaintiffs contend that in order to establish the school district's liability under section 1983, she must "demonstrate both that the defendant's policy, practice or custom played an affirmative role in bringing about the ... abuse and that the defendant acted with deliberate indifference to that abuse." (Pl.'s Brief in Opposition, Dkt. Entry 47 at 8, quoting *Black by Black v. Indiana Area School District*, 985 F.2d 707, 713 (3d Cir.1993).) The implicit, but unsound, premise of this argument is that verbal abuse infringes a constitutionally protected interest. Plaintiffs, however, have not alleged what constitutionally protected interest was infringed by Mr. Cerra's conduct. Absent action by a governmental actor that deprives plaintiff of a constitutionally protected interest, liability cannot be imposed on the governmental entity. *See Burke*, 40 F.Supp.2d at 286 ("municipal liability attaches only when the execution of a gov-

---

**12.** Government policy or custom can be established in two ways. "Policy is made when a 'decisionmaker posses[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy or edict." *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir.1996)(*quoting Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir.1990)), *cert. denied*, 519 U.S. 1151, 117 S.Ct. 1086, 137 L.Ed.2d 219 (1997). "Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decision of its duly constituted legislative body or those officials whose acts

may fairly said to be those of the municipality ." *Monell*, 436 U.S. at 690–91, 98 S.Ct. 2018. Custom, on the other hand, may be proven by evidence of knowledge and acquiescence by an official with final policy-making authority. *Fletcher v. O'Donnell*, 867 F.2d 791, 793 (3d Cir.), *cert. denied*, 492 U.S. 919, 109 S.Ct. 3244, 106 L.Ed.2d 591 (1989). Custom also can be established by "showing that a course of conduct, though not authorized by law, is so permanent and well-settled as to virtually constitute law." *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir.1990).

ernment's policy or custom supports a violation of constitutional rights."). The proper analysis of municipal liability under section 1983 requires a court to determine "(1) whether plaintiff's harm was caused by a constitutional violation and (2) if so, whether [the municipality] is responsible for that violation." *See Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 120, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). Unless the plaintiff can establish that she suffered a violation of a constitutional right, "it is irrelevant for purposes of section 1983 liability whether [the municipality's] policies, enacted with deliberate indifference, caused an injury." *Regalbuto v. City of Philadelphia*, 937 F.Supp. 374 (E.D.Pa.1995)(*citing Mark v. Borough of Hatboro*, 51 F.3d 1137, 1149–50 (3d Cir.), *cert. denied*, 516 U.S. 858, 116 S.Ct. 165, 133 L.Ed.2d 107 (1995)), *aff'd mem.*, 91 F.3d 125 (3d Cir.), *cert. denied*, 519 U.S. 982, 117 S.Ct. 435 (1996); *see also City of Canton, Ohio v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

■  Even assuming that the school district had a policy or custom of inaction towards Mr. Cerra's verbal harassment of students which culminated in the incident involving L.G., plaintiff's claim against the Lakeland defendants fails as a matter of law because plaintiff has not established that L.G. suffered the violation of a constitutional right. As previously discussed, L.G.'s allegations related only to what she characterizes as verbal and psychological abuse; there is no evidence in the record as to any physical force used against L.G.

Although the Supreme Court has recognized a liberty interest in the right to be

free from corporal punishment in schools, *Ingraham v. Wright*, 430 U.S. 651, 673 & n. 41, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977),[13] no court has held that the concept of liberty extends to freedom from verbal abuse or harassment. To the contrary, courts have generally concluded that verbal abuse does not infringe a liberty interest. *See Abeyta*, 77 F.3d at 1256 (noting that in many contexts even extreme verbal abuse was not sufficient to establish a constitutional violation); *Pittsley v. Warish*, 927 F.2d at 7–8 (emotional injury which results solely from verbal harassment is generally not sufficient to constitute an invasion of an identified liberty interest); *Mellerke v. McMurdo*, No. 94–C–2030, 1995 WL 461887, at *2 (N.D.Ill. July 14, 1995)(verbal abuse, intimidation and threats alleged by plaintiff were insufficient to establish a deprivation of a liberty interest under the Fourteenth Amendment).

The Eighth Circuit in *Doe v. Gooden*, 214 F.3d 952 (8th Cir.2000), considered claims against a school district superintendent and former assistant superintendent based upon their alleged deliberate indifference to a teacher's verbal abuse and harassment of students. As in this case, the threshold question was whether the verbal abuse violated an interest protected by the Fourteenth Amendment. In holding that the superintendent and assistant superintendent could not be held liable under § 1983, the court explained:

> [The teacher] is accused of yelling and screaming at students, using foul language, telling students that their handwriting "sucks", telling students that "if you had one eye and half a brain, you

---

**13.** *See also Metzger*, 841 F.2d at 520 ("a decision to discipline a student, if accomplished through excessive force and appreciable physical pain, may constitute an invasion of the child's Fifth Amendment liberty interest in personal security and a violation of substan-

tive due process prohibited by the Fourteenth Amendment"); *Kurilla*, 68 F.Supp.2d at 565 (application of force by a teacher implicates liberty interest protected by the Fourteenth Amendment).

could do this," calling students "stupid," and referring to students as "bimbos," "fatso," and the "welfare bunch." Viewing the evidence in the light most favorable to the plaintiffs, [the teacher] clearly used inappropriate language in his elementary classroom, and while we are appalled at his demeaning and belittling references to his students, *his use of patently offensive language did not violate his students' constitutional rights. Verbal abuse is normally not a constitutional violation.*

*Id.* at 956 (emphasis added).

If the conduct at issue in *Doe* was insufficient to infringe an interest protected by the Constitution, then surely the conduct of Mr. Cerra in this case did not infringe a constitutionally protected interest held by L.G. *See Wagner v. Wheeler,* 13 F.3d 86, 93 (4th Cir.1993) (alleged verbal abuse did not violate constitutional rights); *Bibbo v. Mulhern,* 621 F.Supp. 1018, 1025 (D.Mass. 1985) ("the Fourteenth Amendment does not protect against all intrusions on one's piece of mind .... Despicable and wrongful as it may have been, the verbal abuse, ... falling short of physical force as it did, was not the kind of conduct for which the due process clause provides redress, and instead a remedy must be sought under state tort law."). Because the conduct of Mr. Cerra did not deprive L.G. of any interest protected by the Fourteenth Amendment, plaintiff cannot recover damages from the Lakeland defendants in a § 1983 action premised upon its alleged deliberate indifference to Mr. Cerra's behavior. Accordingly, summary judgment will also be granted for the Lakeland defendants.

## CONCLUSION

Although Mr. Cerra's actions of yelling and humiliating an elementary school student is not to be condoned, his behavior was not shocking to the conscience so as to subject him to liability under § 1983. Because L.G.'s allegations of verbal abuse also do not implicate a liberty interest, and therefore cannot establish a constitutional injury required for municipality liability, summary judgment will also be granted for the Lakeland School District and Superintendent Robert Gigharelli. An appropriate Order is attached.